01

02

03

04

05

06                        UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF CALIFORNIA
07

08 ROBERT LEE JOHNSON,              )
                                     )
09        Petitioner,                )     CASE NO. 2:09-cv-02487-RSL-JLW
                                     )
10        v.                         )
                                     )
11 GARY SWARTHOUT, Warden,           )     REPORT AND RECOMMENDATION
                                     )
12        Respondent.[1]             )
   _____ )
13

14        I.        INTRODUCTION

15        Petitioner Robert Johnson is currently incarcerated at the California State Prison

16 (Solano) in Vacaville, California.  In 1979, he was convicted by a jury of one count of first

17 degree murder, with a prior conviction for second degree murder, and was sentenced in

18 Fresno County Superior Court to a term of twenty-five-years-to-life, plus five years, with the

19 possibility of parole.  (Docket 1 at 1.)  Having exhausted his remedies in the courts of

20 California, petitioner seeks federal habeas corpus relief under 28 U.S.C. § 2254.  Specifically,

21 _____
          [1] Petitioner recently notified the Court that he has been transferred from Deuel Vocational Institute in
   Tracy, California, to the California State Prison in Vacaville, California.  (*See* Docket 14.)  Pursuant to Federal
22 Rule of Civil Procedure 25(d), the Court has therefore substituted petitioner's current custodian Warden Gary
   Swarthout as the respondent in this action.

REPORT AND RECOMMENDATION        - 1

01 he challenges his 2008 denial of parole by the Board of Parole Hearings of the State of

02 California (the "Board").[2]  (*See id.*)

03        Petitioner had been in custody for twenty-nine years at the time of his 2008 hearing

04 and approximately thirty years as of this writing.

05        Respondent has filed an answer to the petition in which he contends that petitioner's

06 state habeas corpus petition failed to comply with California's state court filing rules on

07 successive petitions, resulting in a procedural default that bars federal consideration of his

08 claims.  (*See* Dkt. 12 at 7-8.)  In the alternative, respondent asserts that petitioner's claims are

09 without merit.  (*See id.* at 8-16.)

10        Petitioner filed a traverse to respondent's answer in which he asserts that his petition

11 was not successive and denies each of respondent's arguments.  (*See* Dkt. 13.)

12        Having thoroughly reviewed the record and briefing of the parties, it is recommended

13 that the Court find as follows:

14          (1)     Because the record does not establish with any clarity that the California courts
deemed the petition to be barred as successive, this Court should consider the
15                 petition on the merits;

16          (2)     The U.S. Supreme Court has clearly held that where a state statutory scheme
includes mandatory language that creates a presumption of parole release
17                 based on certain designated findings, that statute gives rise to a federal
constitutional liberty interest in parole;
18

19          (3)     California statutes and regulations contain such mandatory language;

20          (4)     That language provides that a prisoner serving an indeterminate life sentence
has an expectation of parole release unless the Board or the Governor finds that
he will pose an unreasonable risk of danger to society if released on parole;

21

22       [2] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
2005.  *See* California Penal Code § 5075(a).

01      (5)     The California Supreme Court has interpreted this statutory language to provide that an adverse parole decision must be supported by "some evidence" of current dangerousness;

02

03      (6)     Whether "some evidence" of current dangerousness exists is determined in accordance with California law;

04

05      (7)     Applying these standards, the record before the Board in 2008 contained "some evidence" of petitioner's dangerousness;

06      (8)     The denial of parole therefore did not violate petitioner's federal due process rights, and the decision of the Fresno County Superior Court upholding the denial was a reasonable application of clearly established federal law;

07

08      (9)     Petitioner's Ex Post Facto Clause claims should be denied as petitioner fails to demonstrate that the legislative amendments at issue have disadvantaged him; and

09

10      (10)    The Court should deny the petition for a writ of habeas corpus and dismiss this action with prejudice.

11

    II.      FACTUAL BACKGROUND

12

    The Board's 2008 report referenced the 2004 Board's summary of the facts of the

13

commitment offense, but failed to include that summary in the record.  (*See* Dkt. 1, Exhibit C

14

at 6.)  This Court therefore relies upon the Fresno County Probation Officer's Report, dated

15

July 2, 1979, which was included in the record and which summarized the background facts in

16

this case as follows:

17

18             On March 12, 1979 Fresno police officers were dispatched to the scene of a shooting.  Upon arrival, officers observed Charles Williams lying on the ground, bleeding from the abdomen.  The victim was subsequently transported to Valley Medical Center. Approximately one hour later, officers were advised that Mr. Williams had died during surgery.  A subsequent autopsy revealed that the cause of death was due to multiple gunshot wounds.  One of the wounds was in the right chest area, the second in the left chest area, a third wound to the left wrist and a fourth wound to the right abdomen.

19

20

21

22

01        According to the POR, Mrs. Patricia Williams testified that she drove up to her house with friends and observed Robert Johnson exit her home.  She also observed Charles Williams exit the home.  A conversation ensued between Williams and Johnson. Mrs. Williams stated that, although she did not hear the conversation initially, the voices were somewhat soft.  Later however, Johnson began talking in a rather loud voice.  Mrs. Williams exited her car and approached the two men.  As she approached, she heard Johnson state, "You said you wanted to speak to my wife.  There she is.  You want to talk to her.  There she is, because you're not going to talk to her unless you talk to her in front of me."  Williams then lit a cigarette and smiled in Johnson's direction.  Johnson stated, "Don't be smiling in my face man."  Johnson then stepped back, opened his coat, and began firing with a handgun in William's direction.  Patricia Williams testified that at the time Johnson fired, Williams had one hand at his side and another hand at his mouth with a lit cigarette.  Williams then grabbed his side with one hand and grabbed Patricia for support with the other.  Mrs. Williams eased Charles Williams to the ground and then laid on top of him in an effort to prevent Johnson from shooting Williams again.  While they were on the ground, Johnson moved towards the front of them and fired two more shots.

A witness who had been in the vehicle with Mrs. Williams testified that she had observed Johnson at a party a few days prior to the shooting.  He had a handgun at the party.  It was further stated that after the shooting Johnson had said, "That nigger was doomed to die.  If I hadn't shot him, I was going to beat him to death sooner or later."  Mr. Johnson subsequently surrendered to authorities on March 15, 1979.

(Dkt. 1, Exh. A at 4-5.)

During the 2008 hearing, the Board also incorporated by reference petitioner's version of the facts leading up to the commitment offense.  (*See id.*, Exh. C at 7.)  Again, those facts are not included in this record.  (*See id.*) Petitioner was convicted by a jury of one count of first degree murder, with a prior conviction for second degree murder, and was sentenced in Fresno County Superior Court to a term of twenty-five-years-to-life, plus five years, with the

REPORT AND RECOMMENDATION        - 4

01  possibility of parole.  (*See* Dkt. 1 at 1.)  He began serving his life sentence in the California

02  Department of Corrections on July 23, 1979.  (*See id.*, Ex. C at 1.)  Petitioner's minimum

03  eligible parole date was set for August 15, 1998.  (*See id.*)  He has been incarcerated for more

04  than thirty years for this offense and twelve years past his minimum eligible parole date.

05          The parole denial, which is the subject of this petition, followed a parole hearing held

06  on December 31, 2008.  (*See id.*)  This was petitioner's fifth parole application, including his

07  initial parole consideration hearing.  His previous applications were also denied.[3]  After his

08  2008 denial, petitioner filed habeas corpus petitions in the Fresno County Superior Court, and

09  the California Court of Appeal and Supreme Court.  Those petitions were unsuccessful.  This

10  federal habeas petition followed.  Petitioner contends his 2008 denial violated his federal

11  rights under the Due Process Clause and the Ex Post Facto Clause of the U.S. Constitution.

12  Thus, the habeas petition before this Court does not attack the propriety of his conviction or

13  sentence, but solely challenges the Board's 2008 decision finding him unsuitable for parole

14  and the Board's application of post-conviction legislative amendments governing the parole

15  hearing process.

16          III.     PARTIES' CONTENTIONS

17          Petitioner contends that the Board violated his state and federal due process rights by

18  finding him unsuitable for parole based solely upon the immutable facts of the commitment

19  offense and his prior criminal history.  (*See* Dkt. 1 at 5-5a3.)  Specifically, he asserts that there

20  _____

21          [3] Petitioner has had one subsequent parole hearing since his 2008 parole denial.  (*See* Dkt. 12, Exh.7.)
     He has yet to file a habeas corpus petition challenging that decision.  A prior petition, challenging the Board's
     2007 denial, is currently pending before the Honorable Marsha S. Berzon.  (*See* Case No. 2:08-cv-01425-MSB.)
     The parties in that case were recently directed to submit supplemental briefs addressing specific case status-

22  related questions, post-*Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc).  (*See* Case No. 2:08-cv-
     01425-MSB, Dkt. 23.)

01   is "no evidence" to support the Board's conclusion that his expression of remorse was not

02   genuine.  (*See id.*)  In addition, petitioner argues that amendments to the California Penal

03   Code and California Code of Regulations over the past thirty years, including the recent

04   amendment by "Proposition 9, California's Victims' Bill of Rights Act of 2008: Marsy's

05   Law," have violated his state and federal rights to be free from *ex post facto* laws.[4]  (*See id.*)

06   *See* Cal. Penal Code § 3041.5(b)(3)(2009) (Marsy's Law changed aspects of California's

07   parole system, including the frequency and availability of parole hearings for petitioners

08   found not suitable for parole).

09         Respondent claims that the petition should be denied because petitioner procedurally

10   defaulted by filing successive state court petitions.  (*See* Dkt. 12 at 6.)  If the court considers

11   the merits of the federal petition, respondent contends that petitioner does not have a

12   constitutionally protected liberty interest in being released on parole, that the "some evidence"

13   standard is inapplicable in this context, and that even if he does have a protected liberty

14   interest, the Board adequately predicated its denial of parole on "some evidence."  (*See id.* at

15   11-16.)  Respondent also contends that petitioner's Ex Post Facto Clause claim is without

16   merit as "the [2008] amendment creates only the most speculative and attenuated possibility

17   of producing the prohibited effect of increasing the measure of punishment for covered

18   crimes. . . ."  (*See id.* at 9-10.)  Respondent does not address petitioner's claim that thirty

19   years of amendments have also violated his rights under the Ex Post Facto Clause.  In sum,

20   respondent argues that petitioner's federal constitutional rights were not violated by the

21   _____

22         [4] We do not reach petitioner's claims that his state rights under the California Constitution were
     violated, as state claims are not cognizable in a federal habeas petition.  *See Estelle v. McGuire*, 502 U.S. 62, 67-
     68 (1991) (asserting that "it is not the province of a federal habeas court to reexamine state-court determinations
     on state-law questions.").

REPORT AND RECOMMENDATION        - 6

01 Board's 2008 decision, and that the Fresno County Superior Court's Order upholding the

02 Board's 2008 parole denial was not an unreasonable application of clearly established federal

03 law.  (*See id.*)

04         IV.    STANDARD OF REVIEW AND REQUIRED SHOWINGS

05         The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

06 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

07 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

08 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

09 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

10 (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

11 custody pursuant to a state court judgment, even when the petitioner is not challenging his

12 underlying state court conviction.").  Under AEDPA, a habeas petition may not be granted

13 with respect to any claim adjudicated on the merits in state court unless petitioner

14 demonstrates that the highest state court decision rejecting his petition was either "contrary to,

15 or involved an unreasonable application of, clearly established Federal law, as determined by

16 the Supreme Court of the United States," or "was based on an unreasonable determination of

17 the facts in light of the evidence presented. . . ."  28 U.S.C. § 2254(d)(1) and (2).

18         As a threshold matter, this Court must ascertain whether relevant federal law was

19 "clearly established" at the time of the state court's decision.  To make this determination, the

20 Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

21 *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

22

01   remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

02   331 F.3d 1062, 1069 (9th Cir. 2003).

03   The Court must then determine whether the state court's decision was "contrary to, or

04   involved an unreasonable application of, clearly established Federal law."  *Lockyer v.*

05   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

06   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

07   Supreme] Court on a question of law or if the state court decides a case differently than [the]

08   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

09   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

10   state court identifies the correct governing legal principle from [the] Court's decisions but

11   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

12   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

13   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

14   established federal law erroneously or incorrectly.  Rather that application must also be

15   [objectively] unreasonable."  *Id.* at 411.  It is the petitioner's burden to establish that the state

16   court decision was contrary to, or involved an unreasonable application of, clearly established

17   federal law.  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

18   AEDPA also requires federal courts to give considerable deference to state court

19   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

20   Federal courts are bound by a state's interpretation of its own laws.  *See Murtishaw v.*

21   *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme*, 998 F.2d 710, 713

22   (9th Cir. 1993)).  This deference, however, is accorded only to "reasoned decisions" by the

01   state courts.  To determine whether the petitioner has met this burden, a federal habeas court

02   looks to the last reasoned state court decision because subsequent unexplained orders

03   upholding that judgment are presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*,

04   501 U.S. 797, 803-04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

05        In this case, after the Fresno County Superior Court denied petitioner's habeas petition

06   on the merits, petitioner filed petitions in the California Court of Appeal and Supreme Court.

07   (*See* Dkt. 1, Exhs. D, E, and F.)  Both appellate courts denied the petitions summarily.  (*See*

08   *id*.)  This Court should therefore regard the superior court decision as the last reasoned

09   decision of the state courts and should accord that decision the deference required by AEDPA.

10        V.      PROCEDURAL DEFAULT

11        Respondent contends this Court is barred from reviewing both of petitioner's federal

12   claims because petitioner procedurally defaulted when he filed a successive habeas corpus

13   petition in state court.  Because the California Supreme Court cited *In re Clark*, 5 Cal.4th 750

14   (1993), and *In re Miller*, 17 Cal.2d 734 (1941), in denying habeas relief to petitioner,

15   respondent contends that the California Supreme Court found the state habeas corpus petition,

16   upon which this federal petition is based, successive and repetitious.  (*See* Dkt. 12 at 4.)

17        It is a state court's prerogative to decline to review a claim based upon a procedural

18   default.  *See Wainwright v. Sykes*, 433 U.S. 72 (1977).  Absent several well-established

19   exceptions, federal courts are barred from reviewing a federal question decided by a state

20   court when the decision "rests on a state law ground that is independent of the federal

21   question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729

22   (1991).  To be "independent," the state rule must not be "interwoven with the federal law."

01 *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting *Michigan v. Long*, 463 U.S.

02 1032, 1040-41 (1983)).  To be "adequate" the state rule must be "well-established and

03 consistently applied."  *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003) (citing *Poland v.*

04 *Stewart*, 169 F.3d 573, 577 (9th Cir. 1999)).

05       Even if the relevant state procedural rule is found to be independent and adequate, the

06 federal courts will reach the merits of the claim if the prisoner can demonstrate: 1) cause for

07 the default and actual prejudice as a result of the alleged violation of federal law; or 2) that

08 failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*,

09 501 U.S. at 750.

10       Petitioner raised two separate federal Ex Post Facto Clause claims in two separate

11 state habeas petitions, and raised his federal Due Process Clause claim challenging his 2008

12 Board denial in his second state habeas corpus petition.  (*See* Dkt. 12, Exhs. 5 and 13.)  In

13 both petitions, the Fresno County Superior court addressed his claims on the merits.  (*See* Dkt.

14 1, Exhs. D and H.)  The California Court of Appeal denied both petitions without comment or

15 citation to authority.  (*See id.*, Exhs. E and H.)  Though the petitions were filed at different

16 times, the California Supreme Court denied both petitions on the same day.  (*See id.*, Exhs. F

17 and H.)  The first petition was denied without comment or citation to authority.  (See id., Exh.

18 H.)  The second petition was denied without comment, but the court included citations to

19 *Miller* and *Clark*.  (*See id.*, Exh. F.)  After carefully reviewing the record, it appears that the

20 first petition presented only one claim in the California Supreme Court, the Ex Post Facto

21 Claim, and that petitioner did so prospectively, as the Board had not yet applied Marsy's Law

22 to his case.  (*See* Dkt. 12, Exh. 5.)  The second petition presented both his federal Due Process

01 Clause and Ex Post Facto Clause claims, exactly as they are presented in this petition. (*See*

02 *id.*, Exh. 13.)

03      It is difficult to conclude, with any degree of confidence, just what the California

04 Supreme Court intended in citing *Miller* and *Clark*.  In *Miller*, the California Supreme Court

05 denied a habeas petition because the prior petition "was based on the same grounds set forth

06 in the present petition" and "no change in the facts or the law substantially affecting the rights

07 of the petitioner has been disclosed" in the interim.  17 Cal. 2d at 735.  That does not appear

08 to be our case, as the second petition challenged the merits of the denial, but the first petition

09 did not.  Nevertheless, by invoking *Miller* in the second state habeas petition, we know that

10 the California Supreme Court sought to deny "the petition for the same reasons that it denied

11 the previous one," but we do not know whether that denial was for procedural or substantive

12 reasons, or both.  *Kim v. Villalobos,* 799 F.2d 1317, 1319 n.1 (9th Cir. 1986).  *See also Karis*

13 *v. Vasquez,* 828 F. Supp. 1449, 1457 (E.D. Cal. 1993) (holding that a federal court will look

14 through a state court's citation to *Miller* to the basis for decision in the first state petition).

15 Accordingly, the effect of *Miller* is simply to maintain the status quo based upon how the

16 claims were addressed in the first state habeas petition; it does not act as a separate procedural

17 bar to federal habeas review.  *See Ylst*, 501 U.S. at 804 n.3 ("Since a later state decision based

18 upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-

19 existing procedural default, its effect on the availability of federal habeas is nil. . . .").

20      Thus, only the California Supreme Court's citation to *Clark* provides a possible basis

21 for finding petitioner's claims procedurally barred.  The reference to *Clark*, however, could be

22 an invocation of: (1) the prohibition against successive petitions; (2) the bar on piecemeal

01  claims; (3) the bar on untimely petitions; or (4) all of the above.  5 Cal.4th 750.  Because it is

02  unclear whether the California Supreme Court cited *Clark* for a different reason than it cited

03  *Miller*, I recommend this Court choose a different path and decide petitioner's claims on the

04  merits.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not mean to suggest

05  that the procedural-bar issue must invariably be resolved first; only that it ordinarily should

06  be."); *Franklin v. Johnson,* 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are

07  not infrequently more complex than the merits issues presented by the appeal, so it may well

08  make sense in some instances to proceed to the merits if the result will be the same."); *Boyd v.*

09  *Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998) (Circuit precedent makes clear that a court's

10  decision on the issue of procedural default must be informed by furthering "the interests of

11  comity, federalism, and judicial efficiency");  *Samayoa v. Ayers*, 649 F. Supp. 2d 1102, 1115-

12  16 (S.D. Cal. 2009) (citing *Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982)) (when a

13  court decides that the merits of the petition are "less complicated and less time-consuming

14  than adjudicating the issue of procedural default, a court may exercise discretion in its

15  management of the case to reject the claims on their merits and forgo an analysis" of the

16  procedural default issue).  *See, e.g.*, *Martin v. Walker*, 357 Fed. Appx. 793 (9th Cir. 2009)

17  (unpublished) (holding that California's timeliness rule as set forth in *Clark* is undefined and

18  not consistently applied and, thus, petitioner's claims should be considered on the merits),

19  *cert. granted*, --- S. Ct. ---, 2010 WL 621406 (U.S. Jun 21, 2010).

20      In sum, it appears from the state courts' record that the petitions filed with the

21  California State Supreme Court presented different claims based upon a different set of facts

22  and that the basis for the California State Supreme Court's denial is unclear.  Because it

01  would be counterproductive to go through a lengthy analysis of the procedural default issue

02  based upon multiple hypothetical scenarios only to conclude that petitioner's claims are

03  without merit, I recommend this Court decline to render an opinion on whether these claims

04  were successive and instead consider the merits.

05        VI.     FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

06        A.    *Due Process Right Under California's Parole Scheme*

07        Under the Fifth and Fourteenth Amendments to the U.S. Constitution, the federal and

08  state governments are prohibited from depriving an inmate of life, liberty or property without

09  the due process of law.  U.S. Const. amends. V and XIV.  A prisoner's due process claim

10  must be analyzed in two steps: the first asks whether the state has interfered with a

11  constitutionally protected liberty or property interest of the prisoner, and the second asks

12  whether the procedures accompanying that interference were constitutionally sufficient.  *Ky.*

13  *Dep't of Corrections. v. Thompson*, 490 U.S. 454, 460 (1989).

14        Accordingly, our first inquiry is whether petitioner has a constitutionally protected

15  liberty interest in parole.  The U.S. Supreme Court articulated the governing rule in this area

16  in *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1 (1979), and *Board of Pardons v. Allen*,

17  482 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

18  "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme).

19  The Court in *Greenholtz* determined that although there is no constitutional right to be

20  conditionally released on parole, if a state's statutory scheme employs mandatory language

21  that creates a presumption that parole release will be granted if certain designated findings are

22  made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

01  12; *Allen*, 482 U.S. at 377-78.  *See also Vitek v. Jones*, 445 U.S. 480, 488 (1980) ("We have

02  repeatedly held that state statutes may create liberty interests that are entitled to the procedural

03  protections of the Due Process Clause of the Fourteenth Amendment.").

04        As discussed *infra*, the California statutes and regulations at issue in this case contain

05  mandatory language providing that a prisoner serving an indeterminate life sentence has an

06  expectation of parole unless, in the judgment of the parole authority, he "will pose an

07  unreasonable risk of danger to society if released from prison."  15 CCR § 2402(a).

08  Specifically, California Penal Code § 3041(b) provides that the Board "*shall* set a release date

09  unless it determines . . . that consideration of the public safety requires a more lengthy period

10  of incarceration for this individual. . . ."  Cal. Penal Code § 3041(b) (emphasis added).  The

11  California Supreme Court has interpreted this language to provide that an adverse parole

12  decision must be supported by "some evidence" demonstrating current dangerousness.  *See In*

13  *re Lawrence*, 44 Cal.4th 1181, 1204 (2008); *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008).

14  Thus, the California Supreme Court has held that as a matter of state constitutional law, this

15  mandatory language in California's parole scheme creates a liberty interest in parole.  *See*

16  *Lawrence*, 44 Cal.4th at 1204; *Shaputis*, 44 Cal.4th at 1254, 1258; *In re Rozenkrantz*, 29

17  Cal.4th 616, 654 (2002).

18        In addition, the Ninth Circuit recently considered this statutory language in *Hayward*

19  *v. Marshall*, and concluded that the appropriate inquiry for a federal habeas court is whether

20  "some evidence" of current dangerousness supported the Board or Governor's denial of

21  parole.  603 F.3d 546, 562 (9th Cir. 2010).  In other words, the federal Due Process Clause

22  requires that California comply with its own quantum of evidence requirement.  *See id*. at 569

REPORT AND RECOMMENDATION        - 14

01  (Berzon, J., concurring in part and dissenting in part) (asserting that "the majority is correct to

02  review the state court decision here for compliance with the California Constitution's

03  requirement of 'some evidence' of future dangerousness.  The federal Due Process Clause

04  requires at least that much.").  Accordingly, the majority in *Hayward* observed that it did not

05  need to decide "whether a right arises in California under the United States Constitution to

06  parole in the absence of some evidence of future dangerousness."  *Id*.  The *Hayward* court

07  could finesse this ultimate legal issue because it found, as I recommend this Court find in this

08  case, as a matter of fact, that the record contained "some evidence" of petitioner's

09  dangerousness.

10      Critical to our analysis and what the majority failed to articulate, however, is the fact

11  that a state prisoner's right to federal habeas review of an adverse parole decision emanates

12  from clearly established U.S. Supreme Court precedent.  *See id.* at 561.  *See also Estelle*, 502

13  U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a

14  conviction violated the Constitution, laws, or treaties of the United States."); 28 U.S.C. §

15  2241(c) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody

16  in violation of the [United States] Constitution or laws. . . .").  The governing law in this

17  context remains *Greenholtz* and *Allen*.  This Court assumes that the Ninth Circuit in *Hayward*

18  did not intend to overrule decades of U.S. Supreme Court precedent holding that a federal

19  liberty interest arises from a state statute that employs mandatory language creating a

20  presumption that parole release will be granted if certain designated findings are made.  As a

21  result, the undersigned follows the same reasoning as the concurrence, and finds that while

22  petitioner's liberty interest in parole originates from California law, its ultimate protection on

01  federal habeas review arises from the federal due process clause.  *See Hayward*, 603 F.3d at

02  569.

03      To provide a framework for analyzing whether "some evidence" supported the

04  Board's decision with respect to petitioner, this Court must consider the California statutes,

05  regulations and case law which govern decision-making by the Board.  *See Biggs v. Terhune*,

06  334 F.3d 910, 915 (9th Cir. 2003).  Under California law, the Board is authorized to set

07  release dates and grant parole for inmates with indeterminate sentences.  *See* Cal. Penal Code

08  § 3040 and 5075, *et seq*.  At the time of the 2008 hearing, § 3041(a) required the Board to

09  meet with each inmate one year before the expiration of his minimum sentence and normally

10  set a release date in a manner that will provide uniform terms for offenses of similar gravity

11  and magnitude with respect to their threat to the public, as well as comply with applicable

12  sentencing rules.  Subsection (b) of this section also requires that the Board set a release date

13  "unless it determines that the gravity of the current convicted offense or offenses, or the

14  timing and gravity of current or past convicted offense or offenses, is such that consideration

15  of the public safety requires a more lengthy period of incarceration for this individual, and

16  that a parole date, therefore, cannot be fixed at this meeting." *Id.*, § 3041(b).  Pursuant to the

17  mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

18  dates" which take into account the number of victims of the offense as well as other factors in

19  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

20  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

21  § 2402, *et seq*.

22

01   Accordingly, the Board is guided by the following regulations in making a

02   determination whether a prisoner is suitable for parole:

03
04   (a) General. The panel shall first determine whether the life
     prisoner is suitable for release on parole. Regardless of the
     length of time served, a life prisoner shall be found unsuitable
05   for and denied parole if in the judgment of the panel the
     prisoner will pose an unreasonable risk of danger to society if
06   released from prison.

07   (b) Information Considered. All relevant, reliable information
     available to the panel shall be considered in determining
08   suitability for parole. Such information shall include the
     circumstances of the prisoner's social history; past and present
09   mental state; past criminal history, including involvement in
     other criminal misconduct which is reliably documented; the
10   base and other commitment offenses, including behavior before,
     during and after the crime; past and present attitude toward the
11   crime; any conditions of treatment or control, including the use
     of special conditions under which the prisoner may safely be
12   released to the community; and any other information which
     bears on the prisoner's suitability for release. Circumstances
13   which taken alone may not firmly establish unsuitability for
     parole may contribute to a pattern which results in a finding of
14   unsuitability.

15   15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability
16   factors to further assist the Board in analyzing whether an inmate should be granted parole,
17   although "the importance attached to any circumstance or combination of circumstances in a
18   particular case is left to the judgment of the panel." 15 CCR § 2402(c).

19   In examining its own statutory and regulatory framework, the California Supreme
20   Court in *Lawrence* held that the proper inquiry for a court reviewing a parole decision by the
21   Board is "whether some evidence supports the *decision* of the Board or the Governor that the
22   inmate constitutes a current threat to public safety, and not merely whether some evidence

REPORT AND RECOMMENDATION        - 17

01 confirms the existence of certain factual findings." *Lawrence*, 44 Cal.4th at 1212.  The court

02 also asserted that a parole decision must demonstrate "an individualized consideration" of the

03 specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability

04 factors that forms the crux of the parole decision; *the significant circumstance is how those*

05 *factors interrelate to support a conclusion of current dangerousness to the public.*"  *Id*. at

06 1204-05, 1212 (emphasis added).  Although the discretion of the Board in parole matters is

07 very broad, it must offer "more than rote recitation of the relevant factors with no reasoning

08 establishing a rational nexus between those factors and the necessary basis for the ultimate

09 decision – the determination of current dangerousness."  *Id*.  Thus, the California penal code,

10 corresponding regulations, and decisional law clearly establish that the fundamental

11 consideration in parole decisions is public safety and an assessment of a prisoner's current

12 dangerousness.  *See id.* at 1205-06.

13       B.    *Summary of Governing Principles*

14       By virtue of California law, petitioner has a constitutional liberty interest in release on

15 parole.  The Board may decline to set a parole date only upon a finding that petitioner's

16 release would present an unreasonable current risk of danger to society if he is released from

17 prison.  Where the parole authorities deny release, based upon an adverse finding on that

18 issue, the role of a federal habeas court is narrowly limited.  *See Hayward*, 603 F.3d at 562-

19 63.  It must deny relief if there is "some evidence" in the record to support the parole

20 authority's finding of current dangerousness.  *See id*.  That is the determinative issue in this

21 case.

22

01        VII.    ANALYSIS OF THE RECORD IN THIS CASE

02        A.    *Due Process Clause Claim*

03        The Board based its decision that petitioner was unsuitable for parole primarily upon

04   his commitment offense, as well as petitioner's prior pattern of criminal conduct, failure to

05   profit from society's prior attempts to correct his criminality, "problematic relationships . . . in

06   the area of romantic relationships," "lack of insight into causative factors" of his prior

07   criminality, serious misconduct while in prison, a 2008 psychological evaluation that was not

08   "totally supportive of release," and the fact that petitioner appeared to lack remorse for his

09   most recent crime.  (*See* Dkt. 1, Exh. C at 66-69.)  The Board's findings track the applicable

10   unsuitability and suitability factors listed in § 2402(b), (c) and (d) of title 15 of the California

11   Code of Regulations.  After considering all reliable evidence in the record, the Board

12   concluded that evidence of petitioner's positive behavior in prison did not outweigh evidence

13   of his unsuitability for parole.  (*See id*. at 70.)

14        With regard to the circumstances of the commitment offense, the Board concluded that

15   the offense was carried out in "an especially heinous and cruel manner," "a very dispassionate

16   and calculated manner," and "in a manner that demonstrates an exceptionally callous

17   disregard for human suffering."  (*Id.* at 64.)  *See* 15 CCR § 2402(c)(1).  The Board found that

18   the crime "involved jealousy" and that "it was a verbal confrontation that rapidly escalated to

19   deadly force."  (*See* Dkt. 1, Exh. C at 65.)  As noted above, the incident occurred when

20   petitioner's wife's ex-husband (the victim) came to their home looking for petitioner's wife.

21   Petitioner, angered by the victim, shot him multiple times at close range while his wife

22   watched.  The Board also concluded that the motive for the crime was very trivial "in

01 relationship to the magnitude and impact on all parties concerned." (*See id.*) *See* 15 CCR

02 § 2402(c)(1)(E).  The circumstances surrounding the commitment offense and the trivial

03 motive for the crime provide "some evidence" to support the Board's finding that the murder

04 was carried out in an especially heinous and cruel manner.  *See* 15 CCR § 2402(c)(1).

05    The second, third, and fourth factors relied upon by the Board were petitioner's

06 escalating pattern of criminal conduct, prior criminal record, and failure to profit from

07 society's previous attempts to correct his criminality.  (*See* Dkt. 1, Exh. C at 65-66.)  *See* 15

08 CCR § 2402(b) (requiring the Board to consider a prisoner's "past criminal history, including

09 involvement in other criminal misconduct which is reliably documented; the base and other

10 commitment offenses, including behavior before, during and after the crime. . . .").

11 Specifically, the Board asserted that petitioner's escalating "history of criminality" included

12 an extensive juvenile record (prior convictions for receiving stolen property, a number of

13 burglaries, and juvenile probation violations) as well as an adult conviction for second degree

14 murder.  (*See* Dkt. 1, Exh. C at 7-9 and 65-66.)  The Board also found that petitioner had

15 failed to profit from society's prior attempts to correct his criminality.  Specifically, he had

16 prior unsuccessful parole periods, and five months after being paroled for his second degree

17 murder conviction, petitioner armed himself and committed another murder.  (*See id.*)  Thus,

18 there was "some evidence" to support the Board's findings with respect to petitioner's

19 escalating pattern of criminal conduct, prior criminal record, and failure to profit from

20 society's previous attempts to correct his criminality.

21    The fifth factor cited was petitioner's "lack of insight into causative factors" of his

22 prior criminality.  (*See id.* at 66.)  Specifically, the Board found:

> so far as your present and past attitude toward the crime and the present and past mental state, one of the things of concern, you've continued to maintain that you thought the victim had a weapon, in spite of the fact that there's no evidence to support this. The Panel noted you lack insight into the causative factors of your conduct, as evidenced by the fact that in previous versions of the crime it's noted that you armed yourself, that resulted in the second homicide, and this was the previous parole, arming yourself while you were on parole. You continue to make inconsistent statements, specifically that you noted that you didn't shoot the victim an additional two times while the victim was on the ground, noting that you couldn't have done it because your wife was on top of the victim. Well, actually, the report didn't read that the victim was shot an additional two times, it was that an additional two shots were fired.

(Dkt. 1, Exh. C at 66-67.) Based upon the above, there was "some evidence" to support the Board's finding that petitioner did not possess sufficient insight into the causative factors of his criminal conduct.

The sixth factor relied upon by the Board appears to be petitioner's "problematic relationships [that] were noted in the area of romantic relationships." (*Id.* at 66.) It may be that the Board was attempting to characterize petitioner's social history as unstable. *See* 15 CCR § 2402(c)(3). There is little evidence in the record to support such a finding, other than the fact that jealousy appears to have been a contributing factor in the instant offense. In fact, during the hearing, the Board spoke at length regarding petitioner's strong support system, including his extended family, his wife, and his friendships with numerous well-respected corrections officers, many of whom previously supervised petitioner. (*See* Dkt. 1, Exh. C at 10-26 and 33-34.) To the extent the Board was attempting to find that petitioner had a history of unstable relationships with others, such a finding is unsupported by the record.

01          The seventh factor relied upon by the Board was petitioner's disciplinary history in

02   prison.  Petitioner has received four or five CDC 115's for prison-rule violations since 1979

03   (the record is unclear whether it is four or five), the most recent of which occurred in 1994

04   and involved an assault on an inmate.  (*See id*. at 31 and 68.)  He also received seven 128-A's,

05   the most recent of which occurred in 2005 when petitioner was found in possession of a

06   medically authorized bag of ice that was larger than permitted.  (*See id.* at 32 and 68.)  When

07   misconduct is believed to be a violation of law or is not minor in nature, it shall be reported

08   on a CDC Form 115 (Rev.7/88), "Rules Violation Report" and "[w]hen . . . minor misconduct

09   recurs after verbal counseling or if documentation of minor misconduct is needed, a

10   description of the misconduct and counseling provided shall be documented on a CDC Form

11   128-A, Custodial Counseling Chrono."  *See* 15 CCR § 3312(a)(2) & (3).  Although the Board

12   did not weigh this seventh factor heavily against petitioner, it did note that the 128-A

13   violation that occurred in 1996 involved a threat and was "consistent with a pattern of

14   jealousy."  (*See* Dkt. 1, Exh. C at 68.)  In addition, the 2005 offense, while minor, occurred

15   within three years of petitioner's 2008 hearing.  Petitioner's history of rule violations, though

16   diminishing in relevance over time, still meet the very minimal "some evidence" standard and

17   support the Board's finding that petitioner is unsuitable for release on parole.

18          The eighth and ninth factors relied upon by the Board were petitioner's lack of

19   remorse at the hearing and his less than supportive 2008 psychological report regarding this

20   same issue.  (*See id.* at 67.)  Petitioner argues that the Board misinterpreted the psychological

21   report as well as his presentation and response during the hearing.  (*See* Dkt. 1 at 5c.)

22

01      In assessing petitioner's overall risk, the 2008 psychological report, conducted by

02  forensic psychologist Dr. Venard, stated that petitioner was:

03

04              understandably eager to impress others with the changes he has
                made and this attempt at impression management does interfere
                with his natural interactive style at times.  As such, Mr. Johnson
05              presents as less than sincere in his statements of remorse.  The
                undersigned agrees with previous evaluators, however, and
06              notes there is no behavior or verbalized attitude to suggest Mr.
                Johnson is being deceptive in his statements, and he does appear
07              regretful for his past criminal conduct.

08  (*Id.*, Exh. A at 11.)

09      When the Board asked petitioner to define remorse, he stated: "Remorse is forgiving,

10  you know, being forgiven, you know, for the sorrow for what you did.  I am very sorry for

11  what I did."  (*See id.*,  Exh. C at 43.)

12      The Board considered Dr. Venard's findings and petitioner's response to the Board's

13  questions and concluded that:

14              The psychological report from Dr. Venard from June 12th, 2008
                isn't totally supportive of release.  The doctor basically did not
15              find the 1001(a) form, but he did seem to do his best to try to
                address the issues that the previous Panel had requested, and of
16              course, the one of concern to us is the request they made
                questioning the genuineness of your remorse.  First of all, the
17              doctor in the LS/CMI – it's an instrument that is focused on the
                risk of general recidivism and not violence per se, and the
18              doctor indicated at that point that you were in the moderate
                range.  Going to the overall risk assessment, the doctor basically
19              does call into question, he says as such, that you present as less
                than sincere in your statements of remorse.  The doctor makes
20              that conclusion and then attempts to mitigate his own finding,
                which of course, is of concern to the Panel.  We will note for
21              the record that the doctor in the overall sense, despite the
                comments we've already made, did place you in the low risk for
22              future general recidivism, which did include the potential for
                violence. . . .  With respect to the issue of remorse, although you

REPORT AND RECOMMENDATION        - 23

01  claim that you're remorseful, the Panel is not convinced that
you truly understand the nature and magnitude of the offense.
02  Today when given the opportunity to respond to Commissioner
Weaver, you didn't adequately respond, in the Panel's opinion.
03  We also note that there was a hint regarding this issue that was
certainly put on the record by the Panel on November 9th of
04  2007, so it is not a new issue to surface.

05  (*Id.* at 67-68.)

06  Although the Board's conclusion about Dr. Venard's assessment is questionable, this

07  Court must defer to the Board's own assessment of petitioner's response during the hearing.

08  The Board found that while petitioner was deemed a low risk of future general recidivism,

09  including the potential for violence, he was less than candid in his response regarding his

10  remorsefulness.  As the Fresno County Superior Court concluded in assessing this factor,

11  "[g]iven petitioner's somewhat simplistic answer, it appears that the Board's concerns are

12  supported by the evidence in the record.   Lack of insight into the reasons for the inmate's

13  violent behaviour and the inmate's current attitude toward the crime can be a valid basis for

14  denying parole."  (*Id.*, Exh. D at 4, citing *In re Shaputis*, 44 Cal.4th at 1246.)  Like the Fresno

15  County Superior Court, this Court should therefore find that there is "some evidence" to

16  support the Board's finding as to this factor.

17  This Court notes that the Board also considered and weighed the parole suitability

18  factors which favored petitioner, acknowledging petitioner's favorable adjustment to

19  institutional life, that his last CDC 115 was in 1994, that his job reports and programming

20  were excellent, and that he had received favorable recommendations from both custody and

21  "free people" with whom he has worked.  (*See id.* at 60-70.)  As mentioned above, the Board

22  has broad discretion to determine how suitability and unsuitability factors interrelate to

01 support its conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at

02 1212.  Despite petitioner's positive advancement and gains, the Board determined that he

03 remains an unreasonable risk of danger to society if released on parole.  (*See* Dkt. 1, Exh. C at

04 70.)

05         The Fresno County Superior Court considered all of the above factors and the

06 evidence in the record and concluded that the Board's decision was supported by "some

07 evidence" in the record.  I therefore recommend the Court find that the California state courts'

08 decisions upholding the Board's parole denial was a reasonable application of clearly

09 established federal law.

10         B.     *Ex Post Facto Claim*

11         Petitioner contends that the "Parole Authority has been making 30 years of changes

12 that violate the Ex Post Facto prohibitions as applied to me."  (Dkt. 1 at 5.)  Specifically,

13 petitioner asserts that such changes to the parole hearing processes along with the application

14 of Proposition 9 (Marsy's Law) as applied to him have significantly increased the risk of

15 increased punishment.  (*See id.* at 5-5b2.)

16         Respondent contends that the U.S. Supreme Court's decision in *California Dept. of*

17 *Corrections v. Morales*, 514 U.S. 499, 512 (1995), which held that a 1981 amendment

18 authorizing the Board to defer subsequent suitability hearings for up to three years did not

19 present a risk of prolonged confinement sufficient to violate the Ex Post Facto Clause,

20 governs this case.  (*See* Dkt. 12 at 9-10.)  Accordingly, respondent argues that the Fresno

21 County Superior Court's decision applying *Morales* was a reasonable application of clearly

22 established federal law.  (*See id.*)

REPORT AND RECOMMENDATION        - 25

01          The Ex Post Facto Clause of the United States Constitution prohibits the states from

02   passing any "ex post facto law," a prohibition that "is aimed at laws 'that retroactively alter

03   the definition of crimes or increase the punishment for criminal acts.'" *Cal. Dept. of*

04   *Corrections v. Morales*, 514 U.S. 499, 504 (1995).  *See also Weaver v. Graham*, 450 U.S. 24,

05   28 (1981) (providing that "[t]he *ex post facto* prohibition forbids the Congress and the States

06   to enact any law 'which imposes a punishment for an act which was not punishable at the time

07   it was committed; or imposes additional punishment to that then prescribed.'").  The United

08   States Supreme Court has held that "[r]etroactive changes in laws governing parole of

09   prisoners, in some instances, may be violative of this precept."  *Garner v. Jones*, 529 U.S.

10   244, 250 (2000).  In order for a law to violate the Ex Post Facto Clause, "it must disadvantage

11   the offender affected by it."  *Weaver*, 450 U.S. at 29.

12          Petitioner's first contention is a general allegation that thirty years of legislative

13   amendments have increased his punishment.  There is no federal law that supports his claim.

14   Specifically, the U.S. Supreme Court considered the 1981 amendments to § 3041 of the

15   California Penal Code and held that the risk of prolonged confinement that might result due to

16   such amendments was not sufficient to violate the Ex Post Facto Clause where the

17   amendments simply altered the method of setting parole release dates under the same

18   substantive standards.  *See Morales*, 514 U.S. at 512.  In examining subsequent amendments

19   to this same statute, courts have similarly found no ex post facto violations.  *See Giovinco v.*

20   *Carey*, 130 Fed. Appx. 104 (9th Cir. 2005) (unpublished) (holding that the 1994 amendments

21   providing that the Board may schedule parole hearings no later than five years after any

22   hearing where a convicted murder is denied parole did not violate the Ex Post Facto Clause)

01  (citing *Morales*, 514 U.S. at 509).  Accordingly, the Fresno County Superior Court's reliance

02  upon *Morales* was not misplaced and was a reasonable application of federal law as to this

03  portion of petitioner's claim.

04          With regard to petitioner's contention regarding the Board's application of Marsy's

05  Law, this claim is now moot as the Board corrected its premature application of Marsy's Law

06  to petitioner's case and granted him a one-year denial.  (*See* Dkt. 12, Exh. 7; *see also* Case

07  No. 2:08-cv-01425-MSB, Dkt. 24 at 5.)  Accordingly, petitioner's claim that he was subject to

08  increased punishment pursuant to the amendments in Marsy's Law is inapposite as the Board

09  has reversed its position and applied the prior and applicable one-year denial in this case.  I

10  therefore recommend this Court deny petitioner's Ex Post Facto Clause claim.  If the Board

11  applies Marcy's Law to another parole application, petitioner is free to challenge that

12  application in his related federal habeas petition.

13      VIII.   CERTIFICATE OF APPEALABILITY

14          The federal rules governing habeas cases brought by state prisoners were recently

15  amended to require a district court that denies a habeas petition to grant or deny a certificate

16  of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

17  § 2254 (effective December 1, 2009).  Previously, the Ninth Circuit held that a prisoner was

18  not required to obtain a certificate of appealability from administrative decisions, such as a

19  denial of parole.  *See White v. Lambert*, 370 F.3d 1002, 1010 (9th Cir. 2004); *Rosas v.*

20  *Nielsen*, 428 F.3d 1229, 1231-32 (9th Cir. 2005).

21          In *Hayward* the Ninth Circuit overruled "those portions of *White* and *Rosas* which

22  relieve a prisoner from obtaining a certificate of appealability."  *Hayward*, 603 F.3d at 554.  A

01   certificate of appealability is now required to "confer jurisdiction on [the Ninth Circuit] in an

02   appeal from a district court's denial of habeas relief in a § 2254 case, regardless of whether

03   the state decision to deny release from confinement is administrative or judicial." *Id.*

04          In order to obtain a certificate of appealability, a petitioner must make "a substantial

05   showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).  Specifically, if a

06   court denies a petition, a certificate of appealability may only be issued "if jurists of reason

07   could disagree with the district court's resolution of his constitutional claims or that jurists

08   could conclude the issues presented are adequate to deserve encouragement to proceed

09   further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  *See also Slack v. McDaniel*, 529

10   U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he

11   must demonstrate "something more than the absence of frivolity or the existence of mere

12   good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

13          For the reasons set forth in the discussion of the merits in my Report and

14   Recommendation, jurists of reason would not find the result recommended in this case

15   debatable.  Accordingly, I recommend that the Court deny petitioner a certificate of

16   appealability on the issue of whether the state courts' rejection of petitioner's claims was

17   contrary to, or involved an unreasonable application of, clearly established Federal law as

18   determined by the Supreme Court of the United States, or resulted in a decision that was

19   based on an unreasonable determination of the facts in light of the evidence presented.

20          IX.     CONCLUSION

21          For the reasons stated above, this Court finds that as of the 2008 Board hearing there

22   was evidence that petitioner would have posed an unreasonable risk of danger to society or

01  threat to public safety if released from prison.  In addition, petitioner has failed to demonstrate

02  an Ex Post Facto Clause violation.  Accordingly, the Fresno County Superior Court's decision

03  upholding the Board's parole denial on its merits and also denying petitioner relief as to his

04  Ex Post Facto claim was a reasonable application of clearly established federal law.  I

05  therefore recommend the Court: 1) find that petitioner's federal constitutional rights were not

06  violated; 2) deny the petition; 3) dismiss this action with prejudice; and 4) deny a certificate

07  of appealability.

08          This Report and Recommendation is submitted to the United States District Judge

09  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

10  days after being served with this Report and Recommendation, any party may file written

11  objections with this Court and serve a copy on all parties.  Such a document should be

12  captioned "Objections to Magistrate Judge's Report and Recommendation."  Any response to

13  the objections shall be filed and served within fourteen (14) days after service of the

14  objections.  The parties are advised that failure to file objections within the specified time

15  might waive the right to appeal this Court's Order.  *See Martinez v. Ylst*, 951 F.2d 1153 (9th

16  Cir. 1991).  A proposed order accompanies this Report and Recommendation.

17          DATED this 28th day of June, 2010.

18

19

20  JOHN L. WEINBERG
    United States Magistrate Judge

21

22

REPORT AND RECOMMENDATION          - 29